Your Honor's first case in the morning, call 209-1297, Carr v. Marshall, and uh, charge of the complaint, Marshall v. Carr, on behalf of the appellant, Ms. Jennifer Howell, on behalf of the appellee, Mr. Robert O'Donnell. Morning, counsel. Before we begin, we do have apologies from Justice O'Malley. Um, we certainly will miss him today. He apologizes for not being able to be here. We'll certainly miss his intellect, his wit. Uh, but he's recently had knee surgery and is doing fine and is recovering, but he is unable to be here. So, um, please again accept his apologies. Uh, Ms. Howell? May it please the court, I represent the appellants, Harold and Margaret Marshall, and this matter is on appeal from a trial conducted before Judge Raymond McCoskey in Lake County Circuit Court. The trial court found that my clients, Harold and Margaret Marshall, breached their real estate contract, specifically paragraph 16 of that contract, by failing to offer an endorsement to a title policy as a means to insure against loss, which might have occurred following the discovery of an easement on the property during the course of that sales transaction. What I'm asking the court to do today, as the appellant, is first, to review paragraph 16 of the contract, de novo, and hold as a matter of law that paragraph 16 should not have been interpreted by the trial court to specifically and exclusively require an endorsement to the title policy as a means to satisfy the contract. Well, aren't we really reviewing the trial court's factual finding that the Marshalls breached the contract? No, we disagree. We think that the ruling is, and what we're asking the court to do is to interpret paragraph 16, um, the meaning of paragraph 16 and what is required by paragraph 16. What the court's factual findings were, were that the endorsement, that form of a title insurance committee, the endorsement was the industry standard, and therefore, according to his interpretation of the contract, that the industry standard was what was required. What we would like to do is to direct the court to interpret the meaning of the paragraph 16 of the contract. And alternatively, and just a quick summary of where I'm going to go, even if this court were to interpret the contract the same way that the trial court did, that it requires, that is, an endorsement to the policy as the only way to insure title, we're asking this court to find that the trial court's ruling in that regard was wrong. And this is because the Carr's attorney's letter of July 26, 2007, and his communications at that time, and those communications and his belief regarding the, uh, the inapplicability of paragraph 16 to this contract, repudiated the contract by claiming that no title insurance of any kind would satisfy paragraph 16. Thank you. Now, weren't, excuse me counsel. I'm sorry. Weren't the marshals to have provided certain title insurance? And isn't this raise and delete approach that the marshals had talked to the title company about an uncertain title insurance coverage? No, and I don't, and I think if you look at the language of the contract, actually paragraph 16 you'll see that it actually, the raise and delete procedure is envisioned by that, by the terms of the actual contract language. And this is why we think it's a de novo review. You say the raise and delete is envisioned? By the contract, yes. And have you argued that in your brief? Yes, I think we have argued that the paragraph 16 encompasses the raise and delete procedure, yes. And, um, I mean we've always been arguing what paragraph 16 means. There's been no dispute as to what the actual terms are. But we certainly have been arguing as to what paragraph 16 requires. And the CARS have always asserted it was an endorsement. That was not what they asserted in 2007. In 2007 they said no insurance of any kind was acceptable. At trial they argued or their experts argued that an endorsement would have sufficed. But if you look at the language of paragraph 16 of the contract, the language, as I was looking at it before the argument today, it talks about two different things that can happen when you get a title commitment. You can get unpermitted exceptions. Basically the exceptions that are allowed are those that are defined in paragraph 15 of the contract. Unpermitted exceptions, which this easement would be an unpermitted exception if it were not dealt with by the title insurance policy. And it says if the title commitment discloses an unpermitted exception or if the plan of survey shows any encroachments which are not acceptable to the buyer, then the seller can have the exceptions or encroachments removed. And that has always been thought of as physically removed. Or have the title insurance insurer commit to insure against loss or damage that may be caused by such exceptions or encroachments. The very next sentence, if you read on, it says, if the seller fails to have unpermitted exceptions waived. And that is exactly what we're talking about here. Having the exception identified on Schedule B of the title commitment, which would eventually become Schedule B in the policy, the exceptions, anything that the insurance company would not be covering. We're talking about having those exceptions waived. And that happens at real estate closings all the time. You show up on Schedule B, there will be a number, all of the outstanding title issues. There would be if there's a mortgage, if there's liens, it will show the easements of record for utilities, et cetera. And what happens is that the sellers or the title insurance agent will go down Schedule B and will effectively waive them, waive, for example, the mortgage, if they know it's going to be paid off. So eventually you get a title insurance policy without any of those exceptions. But now, counsel, this language also says, or have the title insurer commit to insure against loss or damage. Indeed, doesn't the raise or delete approach leave open the possibility, really, that the title company may assert a defense when time comes to decide whether or not they're going to give coverage? Within the exclusions to the policy, is that what you're talking about? I think that's always possible. Certainly it would be possible if there were an endorsement. They could attempt to use their defenses. But there's really no question that if under the contract all we're required to do is to produce an insurance policy that commits to insure against loss or damage. What's the difference, then, between a raise and delete approach and a specific endorsement? And the way you're explaining it, or I guess the way you're arguing, I don't see that you see a difference. Isn't there a difference in the type of coverage? I think an endorsement is actually a more limited coverage, quite honestly, because an endorsement will, and this is the way Mr. Beatty described it at trial, an endorsement is a specific definition in terms of what the insurance company will cover. If you're looking at the general policy, the policy will cover anything that is not covered or there's not an exception on Schedule B. And by virtue of the fact that the easement would not be identified on Schedule B, it would be a covered risk because it has not been accepted. And the best evidence of this is the marshals themselves had a policy like that, that had no exception for this easement, and they were given coverage under their insurance cover. In fact, Mr. Beatty testified that they were on the hook for that coverage because the easement was not on Schedule B. So I think the raise and delete, if I can answer your question, is broader. It's a broader way, and I think that's why Mr. Beatty proposed it, because it would not be subject to any of the limitations that might be found in an endorsement, but in fact it would not be an accepted matter. It would be just covered under the policy. Wasn't there ambiguity on exactly what was covered in Section Paragraph 16, and there was expert testimony from people in the trade that testified about usage in the trade? I don't think anyone ever argued at trial that the language was ambiguous. Why would they have experts testify as to the meaning of Paragraph 16 and the title coverage? Well, they didn't testify. Actually, they didn't testify as to what Paragraph 16 meant. None of the testimony from the experts went to that. They went to what they called, there was slang used at the trial, and this is where we think if you look at the second sentence after this, or have the title insurance commit to insure against loss or damage that may be caused by such insections or encroachments, we think that is a broader coverage, a broader definition. Insuring against would include both a raise and delete approach and an endorsement policy, and an endorsement approach. What the experts said is that endorsement was the industry standard, and I think they also said that it was more synonymous with insuring over. And if you look at the language here, it says, if the seller fails to have such unpermitted exceptions waived, which is what we believe, and, in fact, George Covington testified that raising and deleting was the same as waiving an exception. He testified that on page 20 of the record. If the seller fails to have the unpermitted exceptions waived, which would be one way of insuring against, or having the title insured over, which is the endorsement, which is what the experts testified to, that insuring over was an endorsement prior to closing. The buyer can elect to take the title anyways, essentially. That's what the language says here. So what we're saying is that insuring against is a broader coverage, is a broader phrase, and it's not synonymous with insuring over, which is an endorsement. And that's the way the experts found, and that's what the trial court found, that insuring over was another way of saying providing an endorsement. Another method of insuring against loss or damage is to waive an exception on Schedule B. Raising and deleting is another slang way of referring to that. So the raising and deleting is expressly, we believe, acknowledged in the contract when it talks about having unpermitted exceptions waived. It was recognized by the witnesses as a method of insuring title, albeit the witnesses, as you suggest, said that endorsing was more the industry standard. We believe that under contract, the contract language, that was really one of the options. It was either to insure against, you can either provide a raise and delete or a waiver of the exception or insure over an endorsement. And the process was also described, it was actually described in the commitment. We were obligated to provide a commitment to insure against. If you look at the title commitment, which was provided to the buyer at the time of closing, they did identify, this is on page 830 of the appendix, in paragraph 19, Chicago title and the marshals did identify the easement and then committed that the exception will not appear on the policy. Essentially, they're committing that that exception will be waived at the time of closing. And we believe that if you could look at the contract, that that concept is acknowledged in the actual contract. One other thing that I would like to suggest is that the trial court's interpretation of paragraph 16 could have an unintended and negative effect upon the residential real estate industry as a whole because this contract, 4.0, is a contract that's used widely in the industry. And wavering of exceptions, waiving, raising and deleting exceptions, is a normal part of the closing process and is a term that's specifically utilized in paragraph 16 of the contract, waiving unpermitted exceptions. If Judge McCoskey's ruling is taken to its end, essentially that would get rid of that whole process or put that process at risk that typically happens at closing where the closing agent will Doesn't put it at end. It's whether the buyer wants to accept that position or not. Well, see, that's the whole purpose of paragraph 16 of 4.0 is to not let the buyer or the seller really be in a position to accept or to have any subjective method of deciding whether title is marketable or not. Paragraph 16, its whole purpose is to establish clarity and an actual bright line for the buyers and the sellers to know that if you can provide a title commitment, title is marketable. So if you're suggesting that paragraph 16 could then be used by the seller, I'm sorry, the buyers to subjectively decide whether or not the title commitment is appropriate or not, I think that defeats the purpose of paragraph 16. Didn't the trial court find that the raise and delete clause was a qualified acceptability by the title company? And when it came, if there was any type of problem with the easement in the future that caused the buyer damages on resale or while he held title, the issue would be whether the title company would pay for that type of easement problem. Because the language that the judge used is, I find that the raise and delete method proposed by the marshals did not comply with their contractual duty under paragraph 16 of the real estate contract to have the title insurer commit to insure against loss or damage that may be caused by the driveway easement. So you have the title company apparently somehow accepting the raise and delete and giving it some type of title authority, but when you get to the bottom line, it apparently wasn't sufficient to comply with the contract, which the way I read the judge's opinion, that usage in the trade meant that raise and delete does not mean that the title company would pay if there were problems with the easement. Well, I don't believe that. Use and enjoyment problems because of the easement. I think what the trial, as I understood the trial going by the trial court's ruling, is that the trial court thought that it didn't commit to insure against loss or damage because there could be this potential, it's a guess, it would provide insurance, but I guess the thought was that perhaps it could be excluded. That was one of the testimony of John Quinn, was that it could be excluded. Certainly the Bosman case that we cited speaks to that because that is the court where that precise thing was rejected. There was a raise and delete situation, and the court said that absolutely, if they know about it, that is an inapplicable exclusion. But our thought is that if you look at the contract, it says to commit to insure against. Judge McCoskey interpreted that as only allowing an endorsement. We think if you look at the contract language, it both envisions both an endorsement or this raise and delete procedure by waiving an unpermitted exception. So the contract language really is what should rule, and we believe that he interpreted it incorrectly. You're taking the position that the contract language you referred to is clear and not ambiguous in every respect. I believe it is clear. I believe that the judge, the trial court, reviewed and interpreted it way too exclusively and too limiting. Counsel, you'll have time on rebuttal. Thank you. Thank you. Mr. O'Donnell. Good morning. Good morning, Your Honors. If I can first, I'd like to address a question that you raised, Justice Zinoff, with respect to what's the difference between raise and delete and an endorsement. As you pointed out, Justice Bowman, the contract language provides two options to the seller in the event that an unpermitted exception like this driveway easement appears. You can either remove it, which was not done here, or you can provide a commitment, get a title insurer commit to insure. And that's the operative word. It's commit to insure. So the factual question that was created at trial, and that's the issue to which the experts testified, was what is in the title insurance industry a commitment to insure? All of the experts, including Mr. Beatty, who provided the raise and delete option to the seller's attorney, testified that there is a difference. The raise and delete scheme, if you will, and I don't say that in a pejorative sense, but that raise and delete scheme is not a commitment to insure. What it provides is it provides the opportunity of the policyholder to make a claim. That's really all it provides is the opportunity to make a claim because the driveway easement would not be listed on Schedule B. So you have the right to make a claim, but obviously the title insurer has the right to respond to that claim in any number of ways by denying coverage because there's a specific condition which does not allow a claim to be made for a known title defect, which this would arguably be. It also gives the title insurer the opportunity to raise all kinds of issues with respect to the value of the encumbrance, in this case the driveway easement. So it falls short of a commitment provided by the seller to the buyer that that buyer will have coverage for this known defect. What the experts testified to was in the title insurance industry, the method by which that commitment to insure is provided is a specific endorsement. That specific endorsement identifies, acknowledges, and accepts the driveway easement and provides an assurance that there will be coverage for that exception should it arise in the future to cause the buyer damage. So I don't think the contract itself was ambiguous. It was clear as to what the seller's obligation was. The method by which that would occur is really what the experts testified to when they distinguished between the raise and delete, which clearly provided an opportunity or the right to make a claim, but that falls short of a commitment to insure, which in the title insurance industry could be realized by a specific endorsement. So that's really what the expert testimony was going to do, and Judge McCoskey clearly ruled that in light of all of that testimony, that clarified and made very clear the fact that the raise and delete scheme fell short of a commitment to insure. Hence, the marshals were in breach of the contract. My clients had the right to terminate and secure the return of their earnest money. So there is a difference, a factual difference, between the raise and delete method and the endorsement. One provides a commitment to insure. One gives the right or opportunity to make a claim, which is something I think we all would recognize as short of a commitment to insure from the title company because with the endorsement, the title company would really be eliminating any possible defenses under the policy it would have. Those defenses under the policy would remain in the raise and delete scheme. I disagree with the characterization that Judge McCoskey found that his finding was that the plaintiff, excuse me, the defendant had failed to provide a specific endorsement. What Judge McCoskey ruled is that they hit the seller, had failed to provide what the contract required, that is either removal of the easement or a commitment to insure. He made no finding that a specific endorsement was in fact absolutely necessary and the only method by which the title insurer could have provided a commitment to insure. The contract, I think, is clear with respect to what the obligation is, and that obligation is to provide a commitment to insure, as I have explained. The expert testimony really didn't go to that issue in helping the court to interpret the contract. The expert testimony went to what in the trade is provided and what is typically provided in order to assure one that the title insurance company would have insured against any loss of damage due to this driveway easement, and that wasn't provided. Really, that's the, I think, the heart of the issue raised by the appellant here, and unless there are any questions, I think the contract was clear and Judge McCoskey's findings were clear. Well, I have a question. I believe the testimony showed or the record showed that Chicago Title was willing to issue a specific endorsement, and weren't the cars required to proceed to closing in order to provide the marshals an opportunity to comply with the contract? Yes and no. Yes, there was testimony of the fact that Mr. Beatty had offered to the seller's attorney, the marshal's attorney, the option of providing the buyer either the raise and delete or an endorsement. The seller's attorney, Mr. Fitzsimons, testimony was unequivocal, only provided the cars with the option of the raise and delete. The question as to whether or not the cars should have proceeded to closing, I think, is foreclosed by the fact that Mr. Fitzsimons, in advance of the closing and in writing, notified the car's attorney that he was canceling the closing. That distinguishes this case from the Seligman decision, whereas in Seligman, there was an issue as to whether or not the property that was being sold was, in fact, held entitled by the seller or some third party. It was clear that Title was, in fact, held by a third party, not the seller, and that was identified prior to the closing. However, the seller's attorney proceeded to closing, attended the closing, showed up at the closing. The buyer's attorney and the buyers did not show up at the closing. The closing was not canceled. So the court in that case held, well, since the obligation to provide good title is an obligation that arises at closing, the buyer's attorney really didn't have any right to preemptively decide that the seller would not be able to deliver. They did not attend the closing, and therefore, there was no determination as to whether or not the seller at closing would have been in a position to convey good title. That's not the case here. The seller's attorney had written to the buyer's attorney well in advance of the closing that he was canceling the closing, and there was no closing, if you will. There was no event by which the seller showed up ready to convey title, ready to satisfy the condition, and therefore proceed to closing. a specific endorsement or some commitment to insure. So that was not provided either. So this case is really distinguished from the Seligman decision with respect to the fact that here it was the seller's attorney that said you got one option. You're either going to proceed to closing, you're going to accept this raise and delete scheme, and nothing else was offered. When that was rejected, he canceled the closing. Now, the record reflects that the cars did seek to terminate this contract before they learned about the easement. Was this at all relevant to the question of breach of contract? It was not for two reasons. One, it clearly occurred, no contrary testimony. It occurred prior to either the car's knowledge or, more importantly, their attorney's knowledge of the driveway easement. Obviously, the record is clear that what occurred is Mr. Carr was diagnosed with a terminal illness. He notified Mr. Marshall of that fact and told him that he inquired as to whether or not Mr. Marshall would allow him to, if you will, back out of the contract and keep the earnest money. That occurred before their knowledge of the driveway easement. If that goes to their motive, it's not relevant. But most importantly is when Mr. Covington, the car's attorney, recognized the driveway easement, he wrote a letter to the seller's attorney really giving him two options, saying, you know, this driveway easement is an encumbrance that we're not going to accept. However, that notwithstanding, Mr. Carr will stand by the offer that he made to Mr. Marshall to walk away from the contract and keep the earnest money. The seller's attorney's response to that was to reject it in writing unequivocally. So the extent to which that offer was, in fact, extended, it was unequivocally rejected. And whether or not that goes to the car's motive to use the driveway easement as a method by which to get out of the contract, if you will, that's really irrelevant. The motive becomes irrelevant. If that was a fortuitous circumstance that the cars stumbled into after recognizing the illness, it's really not relevant to the legal issue before the court. But most importantly is the fact that the Marshall's attorney unequivocally rejected in writing that offer to walk away and keep the earnest money. Thank you. Thank you, counsel. Ms. Howe. Just quickly, I would like to say that, yes, there is a factual difference, and we acknowledge there's a factual difference between an endorsement and the raise and delete process. But it is one that's recognized by the contract, and it's one that doesn't have a legal difference under the terms of the contract, which is why we're seeking a de novo review. I would like to respond quickly, since I have a short period of time, to the question of whether or not Mr. Fitzsimons canceled the closing. I think if you look at the letters, and specifically, really, the July 25th letter from Mr. Fitzsimons to Mr. Covington and Mr. Covington's letter in response to that, it would bear out that that is not what happened. Mr. Fitzsimons offered the title insurance commitment, said, I think this satisfied the issue. I'm treating your letter that I just received saying that you're not going to close subject to the easement as a repudiation and I'm going to cancel the closing unless I hear from you otherwise. In response to that letter, so that was not a complete, I'm canceling the contract. I'm thinking you're not going to close. Let me know if that's not the case. In response to that, Mr. Covington sends the July 26, 2011. We think this letter is critical in terms of the question of breach. The Seligman case says that the marshals could not have been breached seven days before simply by offering this raise and delete procedure, even if this court determined that that's what the contract required. They simply offered it. They had seven days to cure any sort of breach, and the testimony shows that they would have been able to do that. But what they got in response to that letter from Mr. Covington was very, very unequivocal. It says, and I'm directing to the second paragraph of that letter, which begins first. Mr. Covington says paragraph 16 of the contract between the marshals and the cars addresses the questions of unpermitted title exceptions and encroachments. It does not provide the option to obtain title insurance over survey defects that are not encroachments. And he goes on to say at the last sentence, paragraph 16 of the contract simply does not address a title defect of this gravity. The testimony of trial shows, and Mr. Covington reiterated at trial, that he thought the only way the marshals could close is by removing the easement. He did not believe that any title insurance would have sufficed. Endorsement, raise and delete, what have you, he rejected it. And I think if you look at the July 26th letter, that letter tells you why the marshals didn't cure. Because they could have gone back if an endorsement was what would have sufficed, which is what the cars argued at the time of trial would have sufficed. They could have gone back and got it, but instead they were told by Mr. Covington, title insurance is not possible here. It doesn't matter, don't bring it, we're not closing, period. That, I think, if you look at that letter, that explains exactly why the marshals didn't cure when they very so clearly could have cured if that was really what was required. And we think that is the essence of the briefs, even if this court were to interpret the contract as requiring an endorsement. Thank you. Thank you very much, counsel. At this time the court will take the matter under advisement and render a decision in due course. Court stands in brief recess.